IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


MCNISH V. MENARD, INC.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


KERRY MCNISH, APPELLEE,

V.

MENARD, INC., APPELLANT.


Filed October 29, 2019.    No. A-19-042.


Appeal from the Workers' Compensation Court: DIRK V. BLOCK, Judge. Affirmed.

Timothy E. Clarke and Eric J. Sutton, of Baylor Evnen, L.L.P., for appellant.

Jeffrey F. Putnam, of Law Offices of Jeffrey F. Putnam, P.C., L.L.O., for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Menard, Inc., appeals from the Nebraska Workers' Compensation Court's award of benefits to Kerry McNish resulting from an injury he suffered while working for Menard on February 3, 2014. The compensation court ordered Menard to pay McNish temporary total disability payments and permanent total disability payments. The court also ordered Menard to pay for future medical and hospital care necessary as a result of McNish's February 3 injury. For the reasons discussed herein, we affirm the compensation court's findings and award of benefits to McNish.

## BACKGROUND

McNish experienced back pain and injuries long before the injury at issue in the present matter. McNish drove buses beginning in 1985 until he began doing drywall work in Kearney, Nebraska. In 1989, he lifted something as part of a drywall job and injured his back. He also

experienced pain in his right leg at that time. McNish had a laminectomy on August 29, 1989, and received physical therapy thereafter, which he said eventually resolved both his back and leg pain. In a note dated November 9, 1992, McNish's surgeon recommended sedentary work and said that McNish had achieved maximum medical improvement following the 1989 injury.

McNish then worked as an energy auditor, which required him to inspect homes' attics and crawl spaces, until 1996 when he returned to drywalling. McNish testified that a wall fell on him while he was working in the latter part of 2000, which injured his neck. He saw Dr. Dennis McGowan, an orthopedic surgeon, who diagnosed him with a torn rotator cuff and herniated disk. McNish said that he did not remember any work restrictions being implemented at that time. As a result of that injury, he entered a vocational rehabilitation program and earned an associate degree in computer support in 2004 and an associate degree in web page design in 2005. McNish eventually settled a workers' compensation claim relative to that neck injury by lump sum settlement on the basis of his loss of earning capacity. The lump sum settlement was based on a compromise between the parties of loss of earning capacity in the amount of 40 to 45 percent.

During a deposition on June 15, 2015, McGowan testified that he recalled treating McNish for some sort of neck injury in 2001 and described it as "pretty classic neck pain." McGowan remembered performing x-ray-guided injections into McNish's neck, which he said mostly resolved the pain. He said that McNish had some persistent symptoms that he was able to live with. McGowan suggested that McNish remain on nonnarcotic medications to treat the persistent symptoms.

On September 14, 2015, Menard filed a motion to compel records related to McGowan's treatment of McNish in 2001. In that motion, Menard alleged that it had subpoenaed McGowan's records on or about March 31, 2015, but did not receive them. The motion further alleged that Menard had received from a secondary source a "few records" regarding McGowan's treatment of McNish in 2001. Menard alleged that it sent a second subpoena, which outlined the additional records being requested, but had not received those records either. A loss of earning power evaluation report prepared in 2001 cited a note by McGowan restricting McNish to not lift over 30 pounds on an occasional basis, over 10 pounds on a frequent basis, or over 5 pounds on a constant basis. The report said that McNish was able to work at the light-medium physical demand level. The report further noted that McGowan had assigned a permanent impairment rating of 11 percent with respect to McNish as the whole person. Menard filed another motion to compel on November 28, 2017, again alleging that McGowan was withholding records from his treatment of McNish in 2001.

McGowan said that he typically does not retain records for longer than 7 years unless they were from "cases that were interesting." Nevertheless, McGowan said during his deposition that he had staff looking for any records related to his treatment of McNish in 2001 and that the records were not "immediately available." He said that "it would take a while to go looking for" any records from 2001. McGowan said that he would "see if [he] could find those old reports" to satisfy Menard's request.

Trial was held on June 29, 2018. The compensation court began by overruling Menard's motion in limine to exclude the evidence and testimony of McGowan. While the court recognized that McGowan had failed to produce records related to McNish's 2001 neck injury and treatment,

the court declined to hold McNish responsible for his physician's recordkeeping practices. The court noted that the records sought by Menard may have been lost since 2001 or never even existed in the first place. Thereafter, McNish testified in his own behalf, and Menard elicited testimony from Rheanna Mallam, its Human Resources Coordinator in the Kearney, Nebraska, Menard's store. No other witnesses testified, but numerous exhibits were received from both parties.

The parties in this case do not dispute that McNish was employed by Menard on February 3, 2014. McNish began working for Menard in 2005 in the hardware department. A year later, he began working as a salesman to contractors and remained in that position through February 2014. In that role, McNish met with contractors to establish accounts at Menard's, explain promotional sales, and sell products to them. He also serviced existing contractor accounts. Within a month of beginning the contractor sales position, McNish also began delivering their orders, which included lumber, appliances, bathtubs, and showers. McNish spent 2 to 3 days each week traveling to meet with contractors and spent the rest of the week in the Menard's store in Kearney.

On February 3, 2014, another employee helped McNish load an overhead garage door bundle onto his work truck to deliver to a customer. The other employee was inexperienced, however, and lifted his end too high, which caused the bulk of the weight to shift to McNish. McNish testified that he "felt [his] back go" and "felt a short pain" in his mid and lower back. Although McNish finished loading his truck and continued working until the end of the day, he also submitted an accident report and told his manager what had happened.

McNish went to work on the day after the accident, but he worked in the store rather than going out on sales calls. Two days after the injury, McNish sought treatment from his family doctor. Although not reflected in the medical record of his visit, McNish remembered that his family doctor put him on light duty at work. McNish's family doctor did not prescribe any medication, physical therapy, or any other treatment at that time. The doctor's notes reflect that McNish complained of "back pain and back stiffness" but not "lower extremity numbness." Menard accommodated the light duty restriction, allowing McNish to work in the store at a sales desk. Other employees substituted for McNish on his sales calls and deliveries.

McNish testified that the pain worsened during the days after the initial accident and eventually spread to his right leg and foot. He said that he experienced a loss of sensation in his right leg. He again sought treatment from his family doctor on February 21, 2014, this time for "lower extremity numbness, lower extremity tingling and lower extremity weakness" during that appointment according to medical records. The medical records show that McNish was referred to McGowan following that appointment.

On February 28, 2014, McNish again saw his family doctor, describing back and leg pain that caused difficulty walking. During that appointment, he requested to be off work until his appointment with McGowan, which was scheduled for March 3. McNish's family doctor wrote him a note to stay off work until after his appointment with McGowan.

McNish complained of back pain and more significant leg pain during his appointment with McGowan. McGowan observed that McNish walked with an antalgic gait and determined that he likely had a herniated disc, which was causing back pain and radicular pain in his right leg. He had an MRI scan during a followup appointment, which did not show an acute significant disc herniation. However, McGowan determined that McNish had bulging discs, a significant tear in

the lumbar 2-3 disc, and an essential large bulge in the 3-4 disc. McGowan's working diagnosis at that time was that McNish suffered a sprain to his back with an injury to the disc. McNish had a series of three to four nerve root injections in his back, which eliminated his pain for about 4 hours. McGowan recommended that McNish either have a fusion surgery or have a dorsal column stimulator surgically implanted. McGowan testified that the dorsal column stimulator could control McNish's leg pain, which he described as more significant than McNish's back pain. McNish said that he did not want to go ahead with the fusion surgery.

McGowan's final diagnosis was that McNish had suffered a sprain to his back with disc degeneration and that he experienced worse pain in his right leg than in his back. To a reasonable degree of medical certainty, McGowan opined that McNish's symptoms were caused by the injury he suffered on February 3, 2014. McGowan testified that his opinion was based on McNish suffering no symptoms before the February 3 accident, experiencing a back sprain on February 3, and then experiencing lasting symptoms that were not improving. McGowan said that it was "more likely than not" that the back sprain McNish suffered as a result of lifting a bundle of garage doors on February 3 caused his disc to tear.

McGowan further testified that additional treatments may improve McNish's condition and that he had achieved maximum medical improvement without additional treatments. In particular, McGowan was optimistic that the dorsal column stimulator could relieve two-thirds of McNish's leg pain. McGowan placed a sedentary work restriction on McNish, which he said was a direct result of the February 3, 2014, injury because McNish was able to do regular heavy work before the injury but not after the injury. He further noted that McNish would not need medical treatment if the February 3 injury had not occurred.

On September 17, 2014, McNish was examined by Dr. Christopher Cornett, who was retained by Menard. McNish said that Cornett "didn't do anything," did not perform an exam, and spent "[l]ess than 10 minutes" with him. However, Cornett's report indicates that he performed a physical examination of McNish. Cornett's report also shows that he reviewed "all available imaging and all available records," including McGowan's treatment notes and notes from McNish's family doctors. McNish told Cornett of his laminectomy in 1989 and described having no other problems until the injury on February 3, 2014. Cornett found that McNish's number one complaint was right lower extremity pain, which McNish rated at a 10 out of 10, accompanied by low back pain as well.

Cornett's review of different x rays and MRI's showed that McNish had mild degenerative disc disease and very mild bulging but no nerve compression or large herniations. Cornett opined that McNish "likely suffered a lumbar strain at the time of his accident or perhaps a temporary aggravation of his preexisting degenerative disc disease." According to Cornett, there was no explanation based on the records and injury for McNish's ongoing complaints or lower extremity symptoms, and he said that any ongoing problems were more likely related to McNish's preexisting degenerative disc disease rather than the injury. Cornett further opined that McNish needed only 3 months' temporary work restrictions from lifting and bending. He anticipated no permanent work restrictions. Accordingly, Cornett placed McNish at maximum medical improvement 3 to 4 months after the injury on February 3, 2014.

McGowan disagreed with Cornett's assessment regarding the root of McNish's injury. McGowan determined that the lifting accident on February 3, 2014, caused McNish's injury and that the injury was unrelated to preexisting degenerative disc disease as Cornett determined. The degenerative disc disease was not the cause of McNish's injury, according to McGowan, because McNish had been symptom-free until the February 3 lifting accident.

McNish requested an independent medical examination pursuant to Neb. Rev. Stat. § 48-134.01 (Reissue 2010), which the compensation court ordered. The compensation court appointed Dr. Geoffrey McCullen to conduct the independent examination, which consisted of reviewing McNish's medical charts but did not include a physical examination of McNish. McCullen's findings were in line with Cornett's. McCullen opined that McNish likely experienced a temporary aggravation of his preexisting condition as a result of the injury on February 3, 2014, and that McNish had achieved maximum medical improvement within 4 months after his injury. McCullen further opined that McNish had not suffered any permanent impairment or permanent work restrictions resulting from the February 3 injury and that any persisting symptoms resulted from the natural progressions of his preexisting condition. McCullen disagreed with McGowan's recommendation that McNish be treated with a dorsal column stimulator.

In January 2015, McNish went into atrial fibrillation (AFib) during the same period of time that he was being treated with an external dorsal column stimulator. McNish spent 2 days in the hospital, and his AFib has been treated with prescription medication since then. He therefore did not have a dorsal column stimulator surgically implanted as McGowan had recommended but said that he would consider the procedure if his heart improved. McNish later had two heart surgeries, one each in April and May 2017.

On November 21, 2016, McNish saw Dr. John McClellan for treatment of his low back and right leg pain. McClellan's records show that McNish described his pain beginning after lifting a heavy object at work and worsening and spreading as time passed. McNish told McClellan about his 1989 laminectomy and said that he did not have troubles at work until the injury on February 3, 2014. He further described having ongoing back and leg pain since his injury.

McClellan performed an x ray, which revealed degenerative changes at multiple levels of McNish's spine. He also performed an electromyography scan (EMG), which revealed a significant injury on McNish's right side. Based on his review of the records and examination of McNish, McClellan agreed with McGowan and determined that the February 3, 2014, injury was an aggravation of a preexisting degenerative condition. The condition of McNish's back was changed by the accident on February 3. McClellan believed that the surgical implantation of a dorsal column stimulator would alleviate McNish's symptoms and suggested a trial before a permanent implant.

On March 24, 2017, McNish underwent an outpatient surgical procedure in order to begin a trial period with a dorsal column simulator. Records show that McNish "had complete resolution of his symptoms during the time of the spinal cord stimulator trial" and was walking and riding his bicycle without discomfort.

However, at the time of trial on June 29, 2018, McNish described his back as hurting every day without relief. He said the pain causes difficulty doing things, including walking very far "because [his] leg feels like [he's] not going to be able to take another step." He described enduring

"[s]harp pain, sharp, sharp pain" in his leg. Even sitting causes him pain. Nevertheless, McNish testified that, due to his heart condition, he did not want to undergo surgery for the permanent implantation of a dorsal column stimulator.

Despite McNish's ongoing pain, he testified that he is able to ride his bike for about 20 minutes every day on flat ground, which helps manage his pain. He mows his lawn but spreads the work across 3 days in order to avoid getting worn out, which was not a concern before he was injured. Additionally, McNish cares for his grandson, who was 7 years old at the time of trial, and does "light housework" such as washing the dishes. McNish said that he still drives a car but now does not drive outside of town. He acknowledged that he never contacted Menard to see if there were any sedentary positions available because he was in pain all day long. He also did not seek employment elsewhere.

Mallam, Menard's Human Resources Coordinator in Kearney, testified that one of her standard duties is facilitating employees' returns to work following an injury. In consultation with managers, she is able to accommodate any work restrictions and has accommodated sedentary work restrictions for other employees in the Kearney store. Mallam described accommodating McNish when he returned to work immediately following his injury and said that he was able to sit or stand as needed at the contractor desk and was not required to lift heavy objects.

After McCullen advised Mallam that McNish could return to work with no restrictions, she wrote to McNish regarding his continued employment with Menard, first on January 22, 2015, and again on January 30. In her January 30 letter, she told McNish that he remained employed by Menard and was expected to return to work based on McCullen's report that he was fully capable of performing his full duties without restriction. The letter also advised McNish that Menard would consider his lack of response within 5 days as voluntary termination. The letter Mallam sent was returned with a note that said "DEAR MENARDS PLEASE STOP SENDING ME MAIL!" and was signed by McNish. Menard received no other response from him. Accordingly, McNish's employment with Menard was terminated.

Following trial, the compensation court entered its award on December 12, 2018. The court found that McNish was credible. The court further found that the medical opinions offered by McGowan and McClellan, McNish's treating physicians, were more compelling than the opinions offered by McCullen and Cornett. The court noted that McCullen only observed McNish once, and Cornett based his medical opinion on a records review and no physical examination. Although McNish argued that his average weekly wage was $882.23 and Menard argued that it was $704, the court calculated McNish's average weekly wage to be $853.46. The court reviewed two vocational rehabilitation specialists' reports, finding that Lisa Porter, who was appointed by the court, offered more persuasive opinions than Patricia Conway, who was retained by Menard. Based on Porter's report, the court determined that McNish was permanently and totally disabled as a result of the workplace injury he suffered on February 3, 2014. The court therefore found that McNish was entitled to benefits of $568.97 per week from February 28, 2014, through June 15, 2015, for temporary total disability. The court found that McNish was also entitled to benefits of $568.97 per week for so long as he remained permanently and totally disabled.

Menard appeals.

## ASSIGNMENTS OF ERROR

Menard assigns five restated errors on appeal. Menard argues that the compensation court erred in (1) denying its motion in limine to exclude the evidence and testimony of McGowan, (2) finding that McNish suffered a permanent aggravation of a preexisting condition, (3) finding that McNish was permanently and totally disabled and adopting Porter's loss of earning capacity analysis, (4) not apportioning McNish's injuries, and (5) calculating McNish's average weekly wage to be $853.46.

## STANDARD OF REVIEW

Admission of evidence is within the discretion of the compensation court, whose determination in this regard will not be reversed upon appeal absent an abuse of discretion. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016).

Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2018), a judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019).

An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id*. Findings of fact made by the compensation court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Id*.

## ANALYSIS

### McGowan Testimony and Evidence

Menard first argues that the compensation court erred in overruling its motion in limine to exclude the evidence and testimony of McGowan, one of McNish's treating physicians. Menard contends that McGowan withheld medical records from his treatment of McNish's neck injury in 2001. Upon our review, we find that the compensation court did not abuse its discretion in admitting the evidence and testimony of McGowan.

The Nebraska Rules of Evidence do not apply to proceedings before the compensation court. Neb. Rev. Stat. § 27-1101(4)(d) (Reissue 2016). Subject to the limits of constitutional due process, the Legislature has granted the compensation court the power to prescribe its own rules of evidence and related procedure. *Moyers v. International Paper Co.*, 25 Neb. App. 282, 905 N.W.2d 87 (2017). The court can admit such evidence in order to investigate cases in the manner it judges is best calculated to ascertain the substantial rights of the parties and to carry out justly the spirit of the Nebraska Workers' Compensation Act. *Olivotto v. DeMarco Bros. Co.*, 273 Neb. 672, 732 N.W.2d 354 (2007). The act permits the compensation court to admit evidence that, over a proper objection, could not be introduced in a trial court in this state. *Olivotto v. DeMarco Bros. Co., supra*.

There is no evidence in our record to support Menard's allegation that McGowan surreptitiously withheld medical records from his 2001 treatment of McNish's neck injury. Instead, McGowan testified that his office typically retained patients' medical records for only 7 years unless a case was particularly "interesting." McGowan further testified that McNish exhibited "pretty classic neck pain" when he was treated in 2001. Menard subpoenaed McGowan's records in 2015. Therefore, we have no reason to suspect that McGowan's office still possessed records relevant to McNish's routine neck injury some 14 years later when they were sought by Menard. Moreover, the record reflects that McGowan directed his staff to search for any relevant files, but their efforts were unsuccessful. Therefore, we find no abuse of discretion by the compensation court in denying Menard's motion in limine to exclude the evidence and testimony of McGowan.

PERMANENT AGGRAVATION OF PREEXISTING CONDITION

Menard next argues that the compensation court erred in determining that McNish suffered a permanent aggravation of a preexisting condition as a result of the February 3, 2014, workplace injury. By extension, Menard argues that the compensation court erred in finding the opinions of McGowan and McClellan more persuasive than the opinions of Cornett and McCullen. The record before us contains sufficient evidence to support the compensation court's credibility determinations and conclusions regarding the nature of McNish's injury and, thus, we find no error.

In a workers' compensation case involving a preexisting condition, the claimant must prove by a preponderance of evidence that the claimed injury or disability was caused by the claimant's employment and is not merely the progression of a condition present before the employment-related incident alleged as the cause of the disability. *Swanson v. Park Place Automotive*, 267 Neb. 133, 672 N.W.2d 405 (2003). Such claimant may recover when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce disability, notwithstanding that in the absence of the preexisting condition, no disability would have resulted. *Id*.

As the trier of fact, the single judge of the compensation court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Nichols v. Fairway Bldg. Prod.*, 294 Neb. 657, 884 N.W.2d 124 (2016). Where the record presents nothing more than conflicting medical testimony, an appellate court will not substitute its judgment for that of the compensation court. *Id*.

The record in the present case presents conflicting medical testimony, and the compensation court determined that McGowan's and McClellan's opinions that McNish suffered a permanent aggravation of a preexisting condition were more persuasive than the opinions of Cornett and McCullen. McGowan first treated McNish for the present injury one month after it occurred. He observed McNish walk with an antalgic gait, and McNish told him that he was experiencing back pain and right leg pain. McGowan ordered MRI scans, treated McNish with nerve root injections and a dorsal column stimulator, and recommended the possibility of a fusion surgery. Based on his observations and treatment, McGowan determined to a reasonable degree of medical certainty that McNish's symptoms were caused by the workplace injury he suffered on February 3, 2014. McGowan further testified during his deposition on June 15, 2015, that McNish

had achieved maximum medical improvement unless he underwent further treatment. McGowan's treatment recommendation was the surgical implantation of a dorsal column stimulator.

McClellan treated McNish in November 2016 while he was experiencing back and leg pain, which he described as ongoing since the time of the workplace injury on February 3, 2014. An x ray and EMG revealed degenerative changes to McNish's spine and a significant injury to the right side of his back. Like McGowan, McClellan also determined that McNish had suffered an aggravation of a preexisting condition based on his observations and records review.

Meanwhile, Cornett testified that there was no medical explanation for McNish's symptoms and found that any ongoing issue was caused by his preexisting degenerative disc disease and not the workplace injury. Cornett believed that the workplace injury caused only temporary issues for McNish and determined that he had reached maximum medical improvement within 3 to 4 months after the injury. McCullen likewise determined that McNish had suffered a temporary aggravation of a preexisting condition and that any continuing symptoms were caused by the natural progression of his preexisting condition. He opined that McNish reached maximum medical improvement within four months after the injury.

In addition to expert medical testimony, the court also received testimony from McNish regarding his own injuries, which the court found credible. McNish testified that his back and leg pain continued through the time of trial and acted to limit his mobility and activity. He can still drive but now only drives in town, and he can still mow his lawn, but it takes him 3 days. McNish said he is in constant pain, which worsens if he walks for too long. Because he had gone into AFib while he was being treated with an external dorsal column stimulator, he said that he did not want to go through surgery in order to permanently implant a dorsal column stimulator on account of his heart problems. He said that he would only consider having one permanently implanted if his heart improved.

Recognizing that the compensation court is entitled to determine the credibility and persuasiveness of witnesses and that our own judgment shall not serve as a substitution, we find that the compensation court did not err in relying on the opinions of McGowan and McClellan. Thus, we affirm the compensation court's determination that McNish suffered a permanent aggravation of a preexisting condition.

DISABILITY AND LOSS OF EARNING CAPACITY

Menard next argues that the compensation court erred in finding McNish permanently and totally disabled because its conclusion was based on unreliable testimony from McNish and the court-appointed vocational rehabilitation specialist, Porter. Menard contends that Porter's analysis was flawed because it did not properly value McNish's computer degrees. McNish argues in response that the court properly found him to be credible and that the court-appointed vocational rehabilitation specialist's findings were supported by the evidence. We find that the evidence supports the compensation court's conclusion that McNish was permanently and totally disabled and, thus, affirm.

Under Neb. Rev. Stat. § 48-121 (Reissue 2010), a workers' compensation claimant may receive permanent or temporary workers' compensation benefits for either partial or total disability. "Temporary" and "permanent" refer to the duration of disability, while "total" and

"partial" refer to the degree or extent of the diminished employability or loss of earning capacity. *Gardner v. International Paper Destr. & Recycl.*, 291 Neb. 415, 865 N.W.2d 371 (2015). Temporary disability is the period during which the employee is submitting to treatment, is convalescing, is suffering from the injury, and is unable to work because of the accident. *Escobar v. JBS USA*, 25 Neb. App. 527, 909 N.W.2d 373 (2018). Temporary disability benefits under the Nebraska Workers' Compensation Act are discontinued at the point of maximum medical improvement because a disability cannot be both temporary and permanent at the same time. *Krause v. Five Star Quality Care*, 301 Neb. 612, 919 N.W.2d 514 (2018).

When an injured employee has reached maximum medical improvement, any remaining disability is, as a matter of law, "permanent," within the meaning of the Nebraska Workers' Compensation Act. *Krause v. Five Star Quality Care, supra*. Total disability exists when an injured employee is unable to earn wages in either the same or a similar kind of work he or she was trained or accustomed to perform or in any other kind of work which a person of the employee's mentality and attainments could perform. *Escobar v. JBS USA, supra*. Total and permanent disability does not mean a state of absolute helplessness, however. *Gardner v. International Paper Destr. & Recycl., supra*. It means that because of an injury (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do. *Id*.

Whether a plaintiff in a Nebraska workers' compensation case is totally disabled is a question of fact. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016). In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Id*. Moreover, as the trier of fact, the compensation court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id*.

In the present case, McNish described his limitations that were caused by his workplace injury, and the court found him to be credible. He testified that he was in constant pain, unable to walk for extended periods of time, and unable to drive more than short distances. Moreover, his treating physician, McGowan, testified on June 15, 2015, that McNish had achieved maximum medical improvement unless he underwent further treatment such as having a dorsal column stimulator surgically implanted. McNish testified that he did not want to undergo that surgery because he had gone into AFib while being treated with an external dorsal column stimulator and had ongoing heart troubles. McClellan agreed that McNish had reached maximum medical improvement unless he underwent additional treatment. The court found McGowan and McClellan to be credible and their opinions to be more persuasive than Cornett's and McCullen's. The court therefore determined that McNish was temporarily disabled from February 28, 2014, through June 15, 2015, achieved maximum medical improvement on June 15, 2015, and was permanently disabled thereafter. We find no error in these determinations.

The court next found that McNish was totally disabled as of June 15, 2015. This determination was largely based on the reports of the court-appointed vocational rehabilitation

specialist, Porter. Porter interviewed McNish and completed a transferable skills analysis and two loss of earning power reports.

When determining a loss of earning capacity for an injured worker, the four factors to consider under § 48-121 are the worker's (1) eligibility to procure employment generally, (2) ability to earn wages, (3) ability to hold a job obtained, and (4) capacity to perform the work in the job in which the worker is engaged. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019). Loss of earning capacity determinations by court-appointed vocational rehabilitations specialists are entitled to a rebuttable presumption of correctness. Neb. Rev. Stat. § 48-162.01(3) (Reissue 2010). See, e.g., *Ladd v. Complete Concrete*, 13 Neb. App. 200, 690 N.W.2d 416 (2004).

Porter testified that her reports did not account for McNish's workplace injury in 2000 or restrictions because he told her he was fully recovered and was performing at 100 percent of his ability and was doing work at Menard beyond his prior restrictions. She further testified that she had not seen McNish's loss of earning power report related to his workplace injury in 2000.

Porter's transferable skills analysis excluded McNish's information technology and web support degrees, which he obtained in 2004 and 2005. She excluded consideration of those degrees because "[i]t was old education," and McNish had no job experience in those areas. Porter said that he would have to go back and take refresher courses in order for her to consider those skills because "[a]nything beyond 15 years is archaic work history and you throw it out the window." Degrees obtained in 2004 and 2005 were "darn close" to being considered archaic. She described those industries as evolving so quickly that McNish's skills from 2004 and 2005 were essentially not transferrable to present job opportunities. Porter concluded that even if McNish were considered eligible for computer-related occupations, nearly all such occupations require greater than sedentary physical demands, meaning that he was nevertheless still unable to work in those potential occupations.

Porter found that McNish had access to 190 jobs prior to his injury based on his work history and without having any restrictions. Following his injury and because of the sedentary work restriction placed on him by McGowan and McClellan, Porter found that McNish's transferable skills permitted him access to only 11 jobs. Thus, McNish's injury resulted in him losing access to 95 percent of his preinjury labor market. Due to the 95-percent reduction in McNish's access to the labor market, Porter determined that he may be totally disabled under the "odd-lot doctrine," and the compensation court agreed.

Conway, Menard's vocational specialist, disagreed with the opinion offered by Porter. She disagreed with Porter's exclusion of McNish's computer degrees. Conway further disagreed due to Porter's exclusion of sedentary jobs from her analysis because McNish had not previously performed sedentary work. Unlike Porter, Conway concluded that McNish was not totally disabled and had instead only suffered a 75-percent loss of access to the labor market if he had been limited to light/medium work activity prior to the injury and an 80- to 85-percent loss if he had been able to perform heavy work at the time of his injury. Conway further concluded that if McNish was performing a physically appropriate job for Menard, then he suffered a 60-percent loss of earning capacity. However, if McNish's job at Menard was not physically appropriate, Conway concluded he sustained a 45-percent loss of earning capacity.

Nebraska has adopted the odd-lot doctrine under which total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. *Mata v. Western Valley Packing*, 236 Neb. 584, 462 N.W.2d 869 (1990). The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps. *Lovelace v. City of Lincoln*, 283 Neb. 12, 809 N.W.2d 505 (2012).

The compensation court determined that Porter's analysis was more persuasive as it more fully considered the limitations placed by McNish's treating physicians and his own self-described limitations. Porter concluded that McNish was totally disabled under the odd-lot doctrine. While her report excluded McNish's computer-related degrees because they were obtained nearly 15 years ago and unaccompanied by related work experience, Porter also determined that virtually all computer-related jobs required more than a sedentary level of physical demand, thereby still rendering them unavailable to McNish. McNish's sedentary work restriction shrunk his pool of eligible jobs by 95 percent, which resulted in him being considered totally disabled under the odd-lot doctrine. With access to only 11 jobs in his geographical area, the compensation court's determination that McNish was totally disabled based on the odd-lot doctrine was not error, and thus, we affirm.

APPORTIONMENT

Menard next argues that McNish's present disability should be apportioned on account of his prior injury, which occurred in or about 2001 and for which he was compensated at that time. McNish argues in reply that apportionment is not appropriate in any instances of permanent total disability. We recently analyzed the concept of apportionment and determined that, absent a statute requiring apportionment, the doctrine of apportionment is not applicable in our state to cases where successive injuries occur to different parts of the body when the former injury was a compensated injury to the body as a whole and the subsequent injury is also a compensable injury to the body as a whole. *Picard v. P & C Group 1*, 27 Neb. App. 646, ___ N.W.2d ___ (2019). Accordingly, apportionment is not applicable in the present case, and we therefore affirm.

AVERAGE WEEKLY WAGE

Finally, Menard argues that the compensation court erred in calculating McNish's average weekly wage because it included sales commissions and "spif" bonuses, both of which were of fluctuating and uncertain value and frequency. McNish argues in reply that excluding his commissions and bonuses would distort his average weekly wage, particularly because the commissions and bonuses were set forth in his employment agreement and regularly paid prior to his injury. We find no error in the compensation court's inclusion of McNish's bonuses and commissions in its calculation of his average weekly wage, and we therefore affirm.

In workers' compensation cases, the amount of benefits awarded to a claimant is dependent upon the court's calculation of the claimant's average weekly wage. *Mueller v. Lincoln Public Schools*, 282 Neb. 25, 803 N.W.2d 408 (2011). The goal of any average income test is to produce

an honest approximation of the claimant's probable future earning capacity. *Powell v. Estate Gardeners*, 275 Neb. 287, 745 N.W.2d 917 (2008).

For employees who are paid by the hour, the average weekly wage is determined pursuant to Neb. Rev. Stat. §§ 48-121 and 48-126 (Reissue 2010). Section 48-126 provides in relevant part that the term "wages"

> shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident. It shall not include gratuities received from the employer or others, nor shall it include board, lodging, or similar advantages received from the employer, unless the money value of such advantages shall have been fixed by the parties at the time of hiring. . . . In continuous employments, if immediately prior to the accident the rate of wages was fixed by the day or hour or *by the output of the employee*, his or her weekly wages shall be taken to be his or her average weekly income for the period of time ordinarily constituting his or her week's work, and using as the basis of calculation his or her earnings during as much of the preceding six months as he or she worked for the same employer.

(Emphasis supplied.) Sales commissions based on output and earned on a regular schedule are wages for purposes of § 48-126. See *Clifford v. Harchelroad Chevrolet*, 229 Neb. 78, 425 N.W.2d 331 (1988). In determining an employee's average weekly wage, the court in *Clifford* considered the past 6 months' sales commissions he earned because his commissions were paid as a fixed percentage of his sales even though the value of the commissions varied from month to month.

In the present case, the compensation court determined that McNish's average weekly wage was $853.46, which was based on the sum of his straight time, overtime, "spif" sales bonuses, and commercial sales commissions. Menard confines its argument on appeal to the "spif" bonuses and commercial sales commissions. The court found that McNish earned "spif" sales bonuses of $110.11 and $209 and total commercial sales commissions of $5,134.02 during the 26 weeks prior to his injury on February 3, 2014.

The employment agreement between McNish and Menard sets forth the terms of his compensation, including bonuses and commissions. The agreement states that he "will be paid a spif for selling any special order products that qualify." This "spif" bonus, then, is fixed by McNish's output, or sale, of certain qualifying products. The agreement also provides that McNish "may" be paid a "discretionary commission" of 4 percent of the gross margin dollars generated from his sales. Although the agreement indicates that the payment of commissions is not necessarily mandatory, McNish testified that the commissions he earned were always paid and never withheld. McNish's bonuses and commissions were based on output and earned on a regular basis. Accordingly, we find no error by the compensation court in including McNish's "spif" sales bonuses or commercial sales commissions in calculating his average weekly wage and, therefore, affirm.

CONCLUSION

Based on the foregoing, we affirm the compensation court's award of benefits to McNish in its entirety.

AFFIRMED.